United States District Court
District of Massachusetts

```
_____
                                  )
TAJUAN HOLLOMAN,                  )
                                  )
          Plaintiff,              )
                                  )
     v.                           )    Civil Action No.
                                  )    14-12594-NMG
FRANK MAINE and AARON GILL,       )
                                  )
          Defendants.             )
_____)
```

MEMORANDUM OF DECISION

GORTON, J.

This action involves a claim under 42 U.S.C. § 1983 in which plaintiff Tajuan Holloman ("Holloman" or "plaintiff") alleges that defendants Correction Officer Frank Maine ("CO Maine") and Sergeant Aaron Gill ("Sgt. Gill") (collectively "defendants") used excessive force against him while he was a pretrial detainee in violation of his rights under the Due Process Clause of the Fourteenth Amendment.

The Court presided over a two-day bench trial in late November, 2018. The Court now publishes its findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

I.  **Findings of Fact**

    A.  **The Parties and Setting**

    1.  Tajuan Holloman was a pretrial detainee housed at the Souza-Baranowski Correctional Center ("Souza-Baranowski"), a

-1-

maximum security state prison in Shirley, Massachusetts, on June 27, 2012.

2.   Souza-Baranowski houses prisoners assigned to the highest security level of the prison system, as well as pretrial detainees who have previously served time in the state penal system.

3.   Souza-Baranowski housed approximately 1,400 inmates and employed approximately 500 Massachusetts Department of Correction ("DOC") staff in 2012.

4.   Souza-Baranowski has approximately 365 video cameras throughout the prison facility that record 24 hours a day.  The cameras typically store between 10 to 14 days of footage and can store up to a maximum of about 20 days of footage depending on the location and amount of movement recorded.  The cameras automatically tape over older footage to accommodate new recordings as the hard drive reaches capacity.  DOC personnel assigned to Inter Perimeter Security have the ability to download and save video recordings to an external hard drive or medium upon request but apparently there is no way to preserve video on the video recording system itself.

5.   DOC personnel with authority over inmates are organized in a paramilitary structure, i.e. a strict chain-of-command with assigned posts and responsibilities.  That structure includes, in ascending order of rank, Corrections Officer ("CO"), Sergeant

("Sgt."), Lieutenant ("Lt.") and Captain.  A Superintendent supervises the entire prison.

6.   CO Frank Maine and Sgt. Aaron Gill are correctional personnel employed by the DOC and were assigned to Souza-Baranowski on June 27, 2012.

**B.  The Incident on June 27, 2012**

7.   On June 25, 2012, an officer at Souza-Baranowski was stabbed and seriously injured by an inmate.  Correctional staff responding to the stabbing were also assaulted and injured by inmates.

8.   As a result of that incident, Souza-Baranowski was placed on institutional lock-down by order of the Superintendent.  During such a lock-down, inmates are not allowed out of their cells except for court appearances and medical visits.  Inmates are not allowed showers and are fed in their cells.  Correctional staff have no discretion to permit showers during a lock-down.

9.   During a lock-down, inmates with scheduled court appearances are escorted from their cell blocks to "booking" where they are processed and await transportation to court. They are escorted by a transport team that consists of at least two security staff.

10. On June 27, 2012, Souza-Baranowski was still on lock-down.  Holloman was housed on the second tier of the M2 cell

-3-

block and had a court hearing scheduled for that morning.  He
was to be transported to Suffolk Superior Court by the Suffolk
County Sheriff's Department.

11. CO Maine and CO Anthony Basso were the two block
officers assigned to M2 that morning for the 7 A.M.-3 P.M.
shift.

12. At some point in the early morning of June 27th,
plaintiff requested that he be allowed to take a shower before
his court appearance.  That request was denied but he was
advised to ask an officer on the 7 A.M.-3 P.M. shift.

13. Later that morning, at about 8:00 A.M., CO Maine
remotely opened the door to plaintiff's cell and told him to get
ready for court.  Plaintiff walked to the railing just outside
his cell and called to CO Maine, who was located in the control
station on the floor below, to request a shower.  Plaintiff was
dressed in a tank top and shower slippers.

14. It is unclear why CO Maine remotely opened plaintiff's
cell door at that particular time to allow plaintiff to leave
his cell unaccompanied, rather than escort plaintiff from his
cell to the entrance of M2 block.  In any event, it was
understood that plaintiff was to be escorted to "booking" to
await transportation to court.

15. CO Maine told plaintiff that no showers were allowed
because of the lock-down and ordered him to return to his cell

-4-

to get dressed for court.  Plaintiff demanded a shower, requested to speak to a supervisor and refused to return to his cell.  CO Maine ordered plaintiff to return to his cell several more times but Holloman refused to comply with those direct orders.

16. CO Maine called the Level 2 corridor for assistance where both Sgt. Gill and Lt. Donald Ferrara ("Lt. Ferrara") were assigned that morning.  Sgt. Gill took the call from CO Maine.

17. Sgt. Gill promptly proceeded to M2 cell block by himself and ascended the stairs to the second tier with CO Maine where they encountered plaintiff in front of his cell.  Holloman again requested that he be allowed to take a shower but Sgt. Gill denied the request due to the lock-down.

18. Sgt. Gill ordered plaintiff to get dressed and to get his legal materials together for court but Holloman refused.

19. Sgt. Gill then ordered plaintiff to "cuff-up", i.e. turn around and place his hands behind his back so restraints could be placed around his wrists.  Plaintiff complied with the order without resistance.

20. Sgt. Gill and CO Maine escorted plaintiff down the stairs from the second tier to "the flats".  They were met near the entrance of the M2 block by one or two other officers who had been directed to assist with escorting plaintiff to "booking".  Sgt. Gill and one of the other officers each took

one of plaintiff's arms and led him out of M2 block through the Level 2 corridor to "booking".

21. At some point, Sgt. Gill called his supervisor, Lt. Ferrara, to report what had happened and Lt. Ferrara later met Holloman, Sgt. Gill and the other escorting officer(s) at or near M2 block and followed the escort to "booking".

22. When they arrived at "booking", several inmates also were awaiting transport and other correctional officers were present, including CO Brian Dickhaut.  CO Dickhaut offered plaintiff an opportunity to retrieve his legal materials and obtain proper footwear for court but plaintiff refused, commenting that he wanted the judge to see how the guards had sent him to court.  At no point at "booking" did plaintiff complain about an assault or any force being used against him nor did he request medical care.

23. None of the four correctional officers who testified at trial observed any use of force against plaintiff on June 27, 2012, nor any visible injuries to Holloman.

24. At some point after Holloman was delivered to "booking", the Suffolk County officers arrived and he was turned over to their custody for transport to Suffolk Superior Court. During that transportation, plaintiff was provided a pair of state-issued shoes and a state-issued shirt.

25. Holloman met his attorney, James Coviello ("Attorney Coviello"), at the courthouse and told him that his legal materials had been left behind at Souza-Baranowski.  Holloman did not tell anyone at the court about an assault or use of excessive force against him earlier that day at Souza-Baranowski.

26. After spending one night in state custody, Holloman was returned to Souza-Baranowski the next day, June 28, 2012.

27. On June 29, 2012, Attorney Coviello wrote a letter to Souza-Baranowski's Legal Department requesting that Holloman's legal materials be protected and returned to him.  That letter makes no mention of a beating or use of excessive force against Holloman on June 27, 2012.  The Court finds plaintiff's testimony that he told Attorney Coviello about the alleged beating on June 27, 2012, to be not credible in light of all of the other evidence at the trial.

C. **Disciplinary and Grievance Process and Prison Policy Regarding Use of Force**

28. On June 27, 2012, CO Maine wrote a disciplinary report stating that plaintiff had refused direct orders to lock up in his cell but did not decide what disciplinary charges were to be issued against Holloman or how those charges were pursued.

29. Holloman was charged with four disciplinary infractions: 1) refusing a direct order by any staff member, 2)

being out of place or in an unauthorized area, 3) conduct which disrupts the normal operation of the facility or unit and 4) violating any departmental rule or regulation, or any other rule, regulation or condition of an institution or community based program.

30. Holloman received a copy of the disciplinary report before the disciplinary hearing and requested a copy of the video recording of the alleged incident pursuant to the discovery process associated with the prison's disciplinary procedure.  He was informed that no such video recording existed.

31. There was no testimony with respect to exactly when Holloman received the copy of the disciplinary report, when he requested a copy of the video recording or when he was informed that the video recording did not exist and thus the Court is unable to determine whether the request for the video was made within the period during which video recordings are normally preserved at Souza-Baranowski.

32. Because the Court finds that Holloman readily complied with the order to "cuff-up", which does not constitute a "use of force", the DOC's Use of Force Policy is not applicable to this case and Inter Perimeter Security was not required automatically to download and save corresponding video recordings. See 103 Mass. Code Regs. 505.07(1), 505.11(3)(a)-(b), 505.13(3).

-8-

33. Neither CO Maine nor Sgt. Gill had any access to or control over the video recording system so they cannot be held personally responsible for the failure to produce contemporaneous video tapes or any possible spoliation thereof. That is not necessarily true for other DOC personnel.

34. On July 19, 2012 (22 days after the alleged assault), plaintiff filed a grievance with the Institutional Grievance Coordinator ("IGC") against Sgt. Gill for use of "cruel and unusual punishment" by "instruct[ing] six officers to take [him] down" and forcefully handcuffing him before taking him to "booking".  The grievance does not mention that Holloman was punched or kicked by Sgt. Gill or any other COs or that he was banged against the wall on the way to "booking".  On July 25, 2012, the IGC received the grievance form and on August 8, 2012, it determined that the grievance was "non-grievable disciplinary".  Plaintiff appealed that determination the same day.

35. On August 10, 2012, the hearing on the disciplinary report filed against Holloman was held before hearing officer Donald Griffiths.  Mr. Griffiths found Holloman not guilty of any of the charged violations based, in part, on the lack of video evidence to corroborate the disciplinary report.  The hearing officer's report does not mention any accusations by

Holloman of a beating or use of excessive force against him on June 27, 2012.

36. On August 21, 2012, the IGC's determination that plaintiff's grievance was "non-grievable disciplinary" was affirmed by Superintendent Bruce Gelb.

37. Neither CO Maine nor Sgt. Gill had any involvement or input into the disciplinary process or grievance procedure other than the initial filing of the disciplinary report.

**D.  Medical and Mental Health Records and Testimony**

38. In 2012, the DOC contracted with vendors to provide medical and mental health services to inmates.  Vendor medical and mental health staff prepared and maintained plaintiff's medical records and DOC personnel had no control over what was entered into those records.

39. Plaintiff had received medication for anxiety and depression before June 27, 2012, specifically in February and April, 2012.  Those medications included Trazodone and Remeron.

40. On June 27, 2012, plaintiff signed a medical release form of the Suffolk County Sheriff's Department at the Nashua Street jail but that form does not contain 1) any information with respect to medical treatment received by plaintiff while housed at that facility, 2) any complaints that he made about a beating or use of excessive force or 3) any physical injuries

that he had upon arrival at the Nashua Street jail from Souza-Baranowski.

41. On June 28, July 9 and July 13, 2012, plaintiff spoke with mental health personnel while incarcerated at Souza-Baranowski.  The visits on June 28 and July 13 were conducted pursuant to plaintiff's monthly one-on-one contact with mental health personnel while the July 9 visit was conducted because of the institutional lock-down.  The mental health progress notes for those visits contain no mention of any beating or use of excessive force against plaintiff but rather indicate that he was coping adequately with the institutional lock-down and showed no acute mental health concerns.

42. Natalie Toth, the mental health professional who conducted the visit on July 9, testified credibly that plaintiff mentioned something about an incident at court but nothing about a beating at Souza-Baranowski.

43. The July 13 mental health progress note indicates that Holloman told personnel that he was not allowed to take a shower before going to court and that he had to go to court in shower slippers but does not indicate anything about a beating or use of excessive force.

44. On July 13, 2012, plaintiff submitted a sick slip reporting a painful lump on the left side of his neck but the issue was later reported as being resolved without further

-11-

attention from medical staff.  The sick slip is silent with respect to a beating or use of excessive force or any other physical injuries.

45. On July 24, 2012, plaintiff spoke to Dr. Johanna Shaw ("Dr. Shaw"), a psychiatrist at Souza-Baranowski.  Dr. Shaw's psychiatry progress note indicates that Holloman told her that he was stressed, anxious and having difficulty concentrating and sleeping because of his pending legal case and upcoming court hearing.  The note does not, however, reflect that he told her anything about a beating or use of excessive force or any related physical, mental or emotional injuries.  Dr. Shaw diagnosed Holloman with depression and anxiety due to his uncertain legal situation and prescribed Trazodone and Remeron, the same anxiety medications he had taken before.

46. The Court finds plaintiff's testimony that he told medical or mental health personnel at Souza-Baranowski about the beating and his physical injuries not credible because of 1) the lack of any medical or mental health records corroboration and 2) the contrary testimony of contract professionals at the trial.

47. On September 19, 2012, Dr. Shaw again prescribed Remeron to plaintiff.  She also prescribed Benadryl to help with plaintiff's sleeplessness.

48. The Court finds that plaintiff has not demonstrated that the prescription of anxiety medication on September 19, 2012, was related to the alleged beating rather than to his preexisting anxiety and depression.

49. Based upon a lack of any independent testimony or medical records corroborating his version of events or demonstrating that he had sustained physical injuries, the Court finds that plaintiff has not satisfied his burden of proving by a preponderance of the evidence that a beating or use of excessive force against him occurred on June 27, 2012.

50. Based upon a lack of independent corroborating evidence, together with the contradictory testimony of CO Maine, Sgt. Gill, Lt. Ferrara and CO Dickhaut, the Court finds that plaintiff was placed in handcuffs without the use of force on June 27, 2012.

## II.  Conclusions of Law

1.  Plaintiff brings this claim pursuant to 42 U.S.C. § 1983 alleging that Sgt. Gill used excessive force against him in violation of his Fourteenth Amendment rights as a pretrial detainee and that CO Maine failed to intervene in violation of those same rights.

2.  Section 1983 provides that

[e]very person who, under color of any statute, ordinance,
regulation, custom, or usage, of any State or Territory or
the District of Columbia, subjects, or causes to be

subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . .

42 U.S.C. § 1983.

3.   The parties agree and the Court finds that defendants were acting under color of state law on June 27, 2012.

4.   Plaintiff thus has the burden of proving by a preponderance of the evidence that CO Maine and/or Sgt. Gill violated his constitutional rights on June 27, 2012.

5.   The Due Process Clause of the Fifth and Fourteenth Amendments permits the government to detain an arrestee pending a guilty plea or trial if probable cause is found and bail is denied because that detention constitutes regulation rather than punishment. United States v. Salerno, 481 U.S. 739, 746-52 (1987) (explaining that the government's interest in community safety is a regulatory objective that can outweigh a pretrial detainee's liberty interest in appropriate circumstances).

6.   The mere pretrial detention of plaintiff did not therefore violate his constitutional rights.

7.   A pretrial detainee may not, however, be subjected to "punishment" during that detention. Bell v. Wolfish, 441 U.S. 520, 535-36 (1979).  A restriction placed on pretrial detainees constitutes punishment if 1) it is imposed for the purpose of achieving a punitive objective, such as deterrence or

-14-

retribution or 2) it is not reasonably related to a legitimate nonpunitive objective, such as maintaining prison security or discipline, or is unreasonably excessive in relation to such an objective. Id. at 537-39, 561.

8.   In addition to prison restrictions that constitute punishment, the Due Process Clause of the Fifth and Fourteenth Amendments is violated when a pretrial detainee is subjected to the use of excessive force by a security officer. Kingsley v. Hendrickson, 135 S. Ct. 2466, 2473 (2015); Graham v. Connor, 490 U.S. 386, 395 n.10 (1989).  To prove that a use of force is excessive in violation of the Due Process Clause, the pretrial detainee must show that the force was 1) purposefully or knowingly used against him or her and 2) objectively unreasonable based on the facts and circumstances of the particular case and in light of the prison's legitimate security interests. Id. at 2472-73 (listing the following factors as considerations bearing on the reasonableness of the force used: 1) "the relationship between the need for the use of force and the amount of force used", 2) "the extent of the plaintiff's injury", 3) "any effort made by the officer to temper or to limit the amount of force", 4) "the severity of the security problem at issue", 5) "the threat reasonably perceived by the officer" and 6) "whether the plaintiff was actively resisting").

9. A security officer can also be held liable for his or her failure to intervene in appropriate circumstances to protect a pretrial detainee from the use of excessive force by fellow officers. See Miranda-Rivera v. Toledo-Davila, 813 F.3d 64, 73 (1st Cir. 2016).

10. Under the Prison Litigation Reform Act of 1995, however, plaintiffs confined in a jail, prison or other correctional facility must prove that they suffered physical injury before they can recover compensatory damages for mental or emotional injury suffered while in custody. 42 U.S.C. § 1997e(e). The physical injury "need not be significant but must be more than de minimis". Oliver v. Keller, 289 F.3d 623, 627 (9th Cir. 2002); see also Alexander v. Tippah Cty., Miss., 351 F.3d 626, 631 (5th Cir. 2003); Harris v. Garner, 190 F.3d 1279, 1286 (11th Cir. 1999), vacated by 197 F.3d 1059 (11th Cir. 1999), reinstated in part on reh'g en banc, 216 F.3d 970 (11th Cir. 2000); Liner v. Goord, 196 F.3d 132, 135 (2d Cir. 1999). The physical injury requirement applies only to claims for mental and emotional injury and not to claims for compensatory, nominal or punitive damages. Oliver, 289 F.3d at 630.

11. CO Maine, Sgt. Gill, Lt. Ferrara and CO Dickhaut all had a duty to report any assault or use of excessive force against an inmate, any complaint regarding such an assault or use of excessive force or any visible physical injuries on an

-16-

inmate and they were subject to discipline for failure to file such a report.  No such reports were filed by any correctional personnel with respect to Holloman on June 27, 2012.

12. Given that the Court finds that no force was used against Holloman on June 27, 2012, let alone excessive force, and that he complied with Sgt. Gill's order to "cuff-up" without resistance, the Court concludes that plaintiff's due process right to be free from excessive force was not violated.  Even if some force was used to place Holloman in handcuffs, he has not shown through any independent corroborative evidence that the force was not reasonably related to Souza-Baranowski's legitimate interest in escorting a pretrial detainee securely through the facility during a period of institutional lockdown.

13. Plaintiff has submitted no independent evidence of any physical injury, such as medical records or testimony from medical professionals demonstrating that he had reported the alleged beating.  Absent any evidence of physical injury, Holloman cannot recover damages for any alleged mental or emotional injury from the alleged incident pursuant to § 1997e(e).  Furthermore, because the Court finds that Holloman has failed to prove that the alleged beating occurred based on that same lack of evidence, he also cannot recover any compensatory, nominal or punitive damages for a use of excessive force that was not proven.

-17-

14. Because the Court finds that plaintiff has not proven that there was a beating or use of excessive force against him on June 27, 2012, he also cannot recover any damages from CO Maine for Maine's alleged failure to intervene to protect him from that beating.

15. Holloman has not shown by a preponderance of the evidence that the restriction on his access to a shower or having to leave Souza-Baranowski in a tank top and shower slippers without his legal materials was the result of intentional punishment or was not reasonably related to a legitimate nonpunitive objective.

16. With respect to the restriction on his access to a shower, the Court concludes that such a restriction was not impermissible punishment because it was reasonably related to the legitimate nonpunitive objective of maintaining prison security and order after a serious stabbing of an officer and the assault of several others a few days earlier.

17. The Court concludes that 1) neither CO Maine nor Sgt. Gill was responsible for Holloman leaving the prison facility for a court hearing in a tank top and shower slippers without his legal materials, 2) Holloman refused to change into appropriate clothing and shoes for his court appearance and take his legal materials for that hearing despite several opportunities to do so and 3) sending plaintiff to court in a

tank top and shower slippers without his legal materials was not impermissible punishment.

18. Without proving use of excessive force or impermissible punishment, plaintiff has failed to establish a violation of his constitutional rights and thus defendants are not liable to him under § 1983.

19. Although the Court concludes that defendants are not liable to the plaintiff, it finds the lack of video evidence of the incident on June 27, 2012, to be disturbing.  Souza-Baranowski, a high security institution fraught with danger for both inmates and security staff, should have the capability in this age of technology to preserve video recordings for longer than 20 days for the protection of all persons at that institution.  It is inexcusable that a copy of the video recording of the incident in the M2 block on the morning of June 27, 2012, was not downloaded and preserved after the filing of either the disciplinary report or the grievance form.

20. The failure to preserve pertinent video recordings creates perverse incentives for both security staff and inmates to engage in misconduct with impunity.  Had this matter been tried to a jury, the Court would have instructed the jury that it was entitled to draw an adverse inference against defendants based upon the failure of DOC staff to preserve that video evidence.  Although such an adverse inference has not caused

-19-

this fact-finder to rule against the defendants in this case, failure to correct the DOC's video retention procedure may well have detrimental consequences in the future.

### ORDER

For the foregoing reasons, CO Frank Maine and Sgt. Aaron Gill are found not to have violated 42 U.S.C. § 1983. Accordingly, judgment will enter for defendants.


**So ordered.**

_/s/ Nathaniel M. Gorton_____
Nathaniel M. Gorton
United States District Judge

Dated December 7, 2018